# Spring City Brick Company, Appellant, *v.* Henry Martin Brick Machine Manufacturing Company, Incorporated.

*Trial—Charge—Appeals—Portions of charge assigned as error—Inadequacy of charge.*

1. A charge of a court alleged to be inadequate should be viewed on appeal with reference to its general effect. If as a whole it is not calculated to mislead, it is not erroneous. It is not difficult in a charge growing out of controverted allegations of fact to select some portion which, apart from its context, seems subject to objection, but it would be unjust to the trial judge and obstructive to the administration of justice to take strict account of a single period without reference to the other portions of the charge.

2. Assignments of error to the effect that the court below did not specifically charge as to certain matters will not be considered where no request for such instructions on such matters is made.

*Sale—Contract—Warranty—Machine—Evidence.*

3. In an action to recover for a breach of warranty in the sale of a brick drying machine, it appeared that the written agreements described the machine as having a holding capacity of 32,000 wire cut brick. The plaintiff claimed, but without any legitimate evidence to support the claim, that the word "capacity" had reference in the trade to daily productive capacity. There was no allegation of deceit, and it appeared that the apparatus was bought after an inspection of a similar plant. The only objection raised by plaintiff was that it was not as productive as they expected it to be. It did, however, dry from 15,000 to 16,000 brick per day. There was evidence that after the plaintiff had discovered the defect he gave a note for the balance of the purchase money, and paid part of the note. The court submitted evidence offered by the defendant to explain the alleged insufficiency of the machine, as due to the plaintiff's own fault. *Held*, that the whole case was for the jury, and that a verdict and judgment for defendant should be sustained.

Argued Dec. 11, 1908.   Appeal, No. 106, Oct. T., 1908, by plaintiffs, from judgment of C. P. Montgomery Co., March T., 1907, No. 132, on verdict for defendant, in case of Spring City Brick Company v. Henry Martin Brick Machine Manufacturing Company, Incorporated.   Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.   Affirmed.

Assumpsit for breach of warranty for the sale of a machine.

WEAND, J., charged as follows:

The Spring City Brick Company is a corporation doing business at Spring City, in this state, in the manufacture of bricks. The Henry Martin Brick Machine Manufacturing Company is a corporation that deals in what is known as a dryer, the object of which is to dry bricks speedily.   Two suits were brought: one by the Spring City Brick Company against the Henry Martin Brick Machine Manufacturing Company, and the other by the Henry Martin Brick Machine Manufacturing Company against the Spring City Brick Company; but both cases have been tried as one, and therefore you will only be required to render a verdict in the one case.   In order to thoroughly and intelligently understand what the issue here is we must first know the history of the case.

It appears that Mr. Boyer, who is the president of the brick company, saw an advertisement of the Martin company in relation to the dryer.   A correspondence was opened between the parties, which resulted in Mr. Martin and Mr. Boyer, representing the different parties, getting together.   As a result of their meeting Mr. Boyer was invited to go to Egg Harbor, New Jersey, where one of the Martin company's dryers had been erected and was in operation.   He was also invited to go to Haverstraw, New York, where another had been erected and was in operation.   Mr. Boyer visited both of these places and had a meeting with Mr. Martin in New York.   At that meeting, as I understand it, the subject and the price of this dryer was discussed between them.   The Martin company proposed to erect a dryer of a certain capacity, complete in all its parts, for the sum of $6,000.   This, of course, would include the erection

of a building and everything appertaining to the dryer. Either at that meeting or at a subsequent one Mr. Boyer stated that in this calculation of $6,000 there was included the cost of necessary steam pipe, which he said he could buy and sell cheaper than the Martin company had placed it at. He also asked them whether they did not have to employ a local steam fitter or plumber to erect the plant, and stated that he was in that business, and that he might as well do it. It was then arranged that Mr. Boyer, on behalf of the brick company, should do the plumbing, should supply the necessary piping, and erect the building; and in consquence there was a reduction made in the price from $6,000 to $2,100.

The parties appear to have had other meetings, but the result of the whole arrangement was, that at a meeting held in Philadelphia at the Windsor Hotel, Mr. Boyer, on behalf of the brick company, and Mr. Martin on behalf of the dryer company entered into a written contract for the performance of certain things on their respective parts. This contract required that a certain amount of money should be paid down at a certain time. [The dryer company delivered on the ground, as specified in the contract, the necessary parts of this dryer, as set forth in the contract. Mr. Boyer, on behalf of the brick company, proceeded to erect the building and put the parts together, he supplying the piping, valves, and so forth, according to his part of the arrangement.] [1] The brick company paid the stipulated sum of $1,050 which the contract required them to pay on delivery of these parts. The plant was now put in operation. After a certain time the brick company paid another installment of $500 on the contract and gave their note for the balance, which was $630.

On February 28, 1907, the Spring City Brick Company brought suit against the Henry Martin Brick Machine Manufacturing Company, and on the same day the Henry Martin Brick Machine Manufacturing Company brought suit against the Spring City Brick Company. The suit of the brick company against the Martin company was for damages, which the brick company alleged that they had sustained by reason of false representations made by the Martin company with

reference to the ability of the dryer to perform certain work. The suit of the dryer company was on the note which represented the balance due under the contract. It is claimed by the brick company that the Martins made false representations in this, that they represented to Mr. Boyer that this dryer would dry 32,000 bricks in from ten to twelve hours; and it is now claimed in the suit of the brick company that the dryer people failed to do this amount of work, and that this contract was entered into upon the faith of those representations, and they seek now in this suit to recover back what they say they have sustained in the way of loss by reason of those false representations.

In order to determine what the contract was between these two parties it is necessary to refer to that which is written. When parties meet together and reduce their contracts to writing, the writing is viewed by the law as the evidence of what the agreement was which was made between the parties, and that whatever is not part of the written agreement is no portion of the contract. "That which is not found in the writing is presumed to have been abandoned by one party or the other, unless it appears by clear, precise, convincing and satisfactory proof that the part which it is alleged is not in the contract was not in it because of some fraud or by accident left out, or by mistake of the parties was not incorporated therein. It is true that there are contracts oftentimes made by parties where the conversation that took place between the parties at the time they were entering into the contract may be admitted for the purpose of explaining something in the contract which of itself is left doubtful. It is true, as the courts have said, that parol evidence is admissible to show a contemporaneous agreement which induced the execution of the written obligation." The law says that the written agreement is the contract between the parties, and that when any person seeks to change a contract in writing he must do so by clear, precise and indubitable proof; and by that kind of measure of proof is meant that the sources from which the testimony comes must be credible, the statements of the witnesses must be clear and distinct as to what was said and done, and all together it must be of a character to convince the

minds of the jury that the part claimed to have been omitted either by fraud, accident or mistake of the parties, or if not so kept out of the contract, that the party who complains of the omission was induced to sign the contract by a contemporaneous agreement made at the time the contract was signed.

[Now, therefore, we first turn to this contract to see what was written therein; and in reading it we find that there was no express agreement that this dryer, either if sold as a whole or if sold in parts, was guaranteed to do any specific work; and therefore unless the brick company convince you by evidence that the law says must be clear, precise, convincing and indubitable that the Martins made an agreement, upon which Mr. Boyer relied, that it was to do a certain amount of work, the brick company has no case.] [2]

[We now turn to the testimony relied upon by the brick company to convince you that this agreement was made. It is said by Mr. Boyer that at these various interviews Mr. Martin always said and guaranteed that the dryer would dry 32,000 bricks in from ten to twelve hours. You have seen him upon the stand and you have heard his testimony upon that point. The only corroborating testimony that he has is that of a Mr. Curren, who states that at a meeting between Mr. Martin and Mr. Boyer, at Mr. Boyer's office, as he entered the office he overheard a conversation between them to the effect that the dryer was to dry 32,000 bricks in the time specified. These are the two witnesses upon whom the plaintiffs must rest their case.] [3]   And if they have convinced you according to the measure of proof as I have laid it down to you, that that statement was made, then they have progressed in the first step towards a recovery.

Now, no matter what might have taken place at the first or the second interview, the question is, was that the agreement that induced the signing of the contract up to the time when it was signed? Mr. Boyer says it was up to that time. Mr. Curren's testimony relates to the interview in Norristown, and you will remember that the contract was signed in Philadelphia; and therefore the conversation which Curren overheard was not the last conversation between them; but still it can be used

to corroborate Mr. Boyer and to show that these assertions had been made by the Martins. Now I charge you that unless the brick company have established to you by the weight of the testimony that that was the contract or agreement, your verdict would have to be in favor of the Martins for the amount of their note with interest. It is a rule of law that the plaintiff must convince the jury by the weight of the testimony. If it stands evenly balanced, or if the jury are in doubt as to which way it inclines, it must be for the defendant, because then the plaintiff has not established it by the weight of the testimony.

On the part of the Martins this conversation and agreement is denied. Mr. Martin states it most positively that he never agreed to that at any time in the manner stated by Mr. Boyer. While the Martins do not deny that they would stand by an agreement that their machine under certain circumstances would do a certain amount of work, they contend that under this agreement no such understanding was had. You have, therefore, the testimony of the defendants in flat contradiction of that of the plaintiffs, and it is for you to say which side you will believe. It is said on the part of the defendants that where they contract to deliver a dryer, put up and arranged according to their system and their blue prints and plans, for which they are responsible, there is charged as the price of that machine a certain amount to indemnify them against mistakes of their men or against accident, and because they are in business for profit and therefore expect to make something out of their contract; but they contend that where they only sell the material parts and the buyer of these parts undertakes himself to supply the workmen to erect the parts and put them together, they never would guarantee in the manner stated by Mr. Boyer; and [this very contract in certain parts provides: "It is also agreed that the party of the second part will furnish the foundations for the material, put up the entire building, dig trenches, and furnish well for return hot water, and that the party of the first part shall not be liable for any part of the material not working properly furnished by the party of the second part. The party of the second part shall be responsible for any damage or loss by fire after it reaches Norristown."

So you will see by this agreement that the brick company had assumed a certain responsibility, which, if it had been for the sale of the entire dryer to be put up by the Martin company, they would have to assume; and they argue to you that it is unreasonable to suppose that they would guarantee this part of the work when somebody else had assumed the responsibility of putting it together and supplying the parts.] [4]

Therefore, your first question is, what was the contract between the parties?  [If you find that there was no agreement as testified to by Mr. Boyer, then you can stop right there and render a verdict for the dryer company for the amount of their note with interest.] [5]   Assuming, for the sake of the instructions to be given you that the jury find in favor of the brick company up to that point, then your next query will be, did the machine do its work properly?   It is claimed by the brick company, and testified to by Mr. Boyer and the rest of their witnesses who were concerned in its operation, that it did not dry the 32,000 bricks in the specified time.   They all agree that so far as that was concerned it was a failure.   Is there any evidence to contradict that?   If there is, you will take that into consideration. If you find that it did not do that amount of work, then you will proceed to another question before the plaintiffs are entitled to recover.   [If it did not do the work, why not?   Because if the failure to do the work properly was the fault of the construction of the machine, then the fault is not with the dryer company but is with the brick company, which undertook to put it together.] [6]   It is claimed by the defendants that the reason why this machine did not do the work, if it did not, was because Mr. Boyer departed from the blue prints and put this machine together in a manner to suit himself.   If that is the case, if he failed to follow the blue prints as furnished by the dryer company, and adopted a system of his own, and that was the reason of the failure, the brick company must suffer, and not the dryer company.

You have heard the testimony of a number of witnesses upon this question: Mr. Mehaffey says he was the man that was sent by the dryer company to superintend the construction of it, Mr. Boyer to do the work.   He says that when he went

there it had been partly erected. He says that he told Mr. Boyer that it was not according to the plans and blue prints. The blue prints were there, he says. Then he tells you why it was not the difficulty with the foundations that the ground was uneven, and so forth, and that the cupola was not right; and he declares that Mr. Boyer said that as done it was better than the blue prints. He says that the plans contemplated steam to be introduced in a certain way, and that this was not done. This man, although the employee of the dryer company, afterwards entered the employ of the brick company to manage it, and he worked there for some time; and he tells you why at one time it would not work. He says that he tried it one night but they ran short of coal and that therefore it could not be tried thoroughly; and [he tells you that what the real trouble was, according to his opinion—it is for you to judge, of course, whether it is correct or not—was the trouble with the labor and getting the bricks out to the kiln, and in this he is corroborated by other testimony, going to show that the complaint which the brick company made was because of the difficulty of getting men to operate the plant and of the difficulty of getting the bricks from the dryer to the kiln. Mehaffey says that they did not have force enough, and so forth, and that was the reason why, if the 32,000 bricks had been burned, they could not have been gotten out.] [7]

It is also claimed by the defendants, by several witnesses, that there was a faulty construction in the manner in which the building itself was erected; that in order to preserve a high, even temperature it was necessary that the building should be inclosed in a certain way, but that this building was not so erected; that there were openings along the bottom which al lowed the air to get in. [It is also said that the foundations were not properly constructed in order to carry off the moisture which was driven from the bricks by the steam; if this was so, whose fault was it? If it was the fault of incompetent men of incompetent construction of the brick company, they must bear the loss.] [8] [You will recall the testimony of Mr. Grob, the German who operated the plant at Egg Harbor, and he says to you that when Mr. Boyer came to examine the plant at

Egg Harbor, he, Grob, showed him all over and explained to him how it should be operated; and there was one caution which he particularly gave to him: "Be sure to follow the blue prints. I made that mistake and it took us some time to correct it." That was the caution which he then gave to Mr. Boyer before the contract was signed.] [9] [It is claimed by the witnesses who saw this dryer put up, and by both of them, that Mr. Boyer said he had ideas of his own; and if he had, and if they were different from the ideas as expressed in the blue prints, and he followed them, then it was his misfortune and not the fault of the dryer company.] [10]

It is also said that Mr. Callaway, who was sent there by the dryer company, condemned this machine and expressed surprise that the dryer company would put it up. That was very strong language to use. He is not here to explain what he meant. But Callaway had been employed by the dryer company to erect their dryer according to their system and their plans and their blue prints, and when he came there and saw the manner in which it was constructed he then used that language. If it was in his mind at that time that the dryer company had done this work in that way then his language can be explained, or can the jury find that although he was in the employ of the dryer company he would just on that condemn their whole work? It is unfortunate that he is not here, but it is for the jury to place such construction upon his language as they may think proper, if they think that what he said there ought to bind the defendant company.

I can say to you that if you find that this dryer did not work, although guaranteed, because it was improperly constructed, and if you find that Mr. Boyer said that he had ideas of his own, if you find that it was constructed according to his ideas and not according to the blue prints, and that that was the cause of the failure, then the brick company must suffer and not the dryer company. It is said on behalf of the dryer company that Mr. Boyer requested the privilege of supplying the piping, doing the plumbing work and erecting the building, and their contract no longer was for the erection of the dryer, but merely for the sale of certain parts of the dryer, and that be-

cause they only sold those parts the price was reduced, and they had no responsibility for the work which they were not required to do. If we turn to the contract itself it may throw some light upon this subject. [The contract says that the dryer company agreed to Mr. Boyer the hereinafter described materials—not a dryer—but the hereinafter described materials for the construction of one latest improved Martin patent steam dryer, having a holding capacity of 32,000 wire cut bricks, calculated on the basis of nine bricks to each palette." What was that material to be? Then they go on to describe what it is: "Forty complete cast-iron racks" and so forth, and describe all the parts constituting the material which they agreed to deliver, and it is admitted by the brick company that every article mentioned in this contract was delivered. When this contract says that it is a contract for materials for the construction of a thing, and then provides that the person who buys it is to construct it, it is a question for the jury as to what was sold.] [11] Generally the court is required to construe written contracts, but in many cases the question can be referred to the jury; and I now refer it to you, as to whether or not under that contract the dryer company agreed to furnish a dryer taken as a whole to do the work or whether they merely contracted to serve certain materials, the brick company to furnish the other and to construct it according to the plans and specifications of the dryer company.

[If they only contracted to serve parts, we can come back to the question, would they have guaranteed the thing to do certain work when the brick company itself was to put it up?] [12]

It is said by the defendant company that no complaint was ever made about this machine not doing its work until this suit was brought, and they have introduced the testimony of one, even two witnesses—two, I think—that Mr. Boyer agreed that the dryer had done the work. At the meeting in Lancaster Mr. James P. Martin testified that Mr. Boyer said that, "So far as the dryer is concerned, there is no fault, it is a good dryer; but the handling is too hard and the labor question is what troubles us." On the part of the other Martin they all said

that there was no complaint until the suit was brought, except the complaint about the incompetency of their labor and the difficulty of their getting labor, because of the difficulty of removing the bricks from the dryer to the kiln, and, I suppose, because of the hard work owing to the temperature. Mr. Shaar was sent to Spring City as late as June and July with a statement. He says Mr. Boyer made no complaint at that time about the dryer. Mehaffey says there was no complaint made whilst he was in the employ of the brick company as to the dryer not being all right, but it was as to the labor question and the difficulty of removing the bricks.

If you find this to be the case, the next question is, why does the brick company take this position? If it was not because of the work of the dryer itself, but merely because they found that the system which they had bought required too much labor to remove the bricks, then that is no fault of the dryer company, because Mr. Boyer on his visits to Egg Harbor and Haverstraw had full opportunity of seeing what labor would be required and what the difficulty was; and therefore if their position to-day arose from the mere fact that it cost them too much or that they could not get hands to do the work, that was no fault of the dryer company. It is said by the plaintiffs, however, that they did complain, that they wrote a letter in July to the dryer company in which they complained of this machine. You will recall the expression used: "They have had considerable trouble in getting dry brick enough to keep the plant moving." Was that the fault of the dryer, or the fault of the temperature, or the engineer who had it in charge, or because they did not have labor enough?

You will remember the conversation that Mr. Grob had with Mr. Degan, I think it was one of the employees of the brick company, in which he complained that they had some man who had been accustomed to the old system of doing things. What importance can you attach to that as bearing upon the question as to whether that complaint really was that the dryer would not do the work, or whether it was because of the difficulty of getting the bricks out, that they could not get enough, or because the labor question entered into it?

Now we come to another point in the case which may have great significance. [This dryer was delivered in April, if I recall it. The first complaint, if it was a complaint, was this letter dated in July. Mr. Boyer says, and his witnesses, that at no time did the dryer work satisfactorily. They had it, then, part of April, May, June, and part of July, and therefore they had an opportunity to give it a fair test.] [13] Yet we find that on July 29 the brick company sent a note, the balance due as per statement, showing that there was due then $1,126.71. On July 31 the dryer company acknowledged the receipt of that letter. On October 16 the brick company wrote the dryer company that the note was about falling due, and asking for a renewal by payment of $500 on account. On October 17 the dryer company wrote back accepting the note, and on October 30 the brick company sent a new note and paid $500 on account.

[The question now for you to consider is, whether this conduct was consistent with the theory that the brick company was dissatisfied with the dryer. They had had months to investigate the matter. According to their own witnesses they knew that it was a failure, and yet they themselves sent to the dryer company a written statement acknowledging their indebtedness and paying $500 on account and giving a new note for the balance. What construction do you place upon that act? Would an ordinary business man, if he knew on October 30 that he was not indebted to these people, that he had been wronged by fraudulent representations, and had been induced to buy an article which proved an entire failure, yet at that time make out a statement which, in so many words, said: "We owe you so much, and we pay you $500 on account, and agree by this to pay you $630 more?" This is a very important question for you to take into consideration as bearing on the faith of the brick company when it declares that the machine had been a failure and that they had expressed their dissatisfaction with it. If you find from their conduct that up to that time they had admitted, by the payments or by their failure to complain as to the working of the machine, you will be justified in finding, that they were satisfied with it and that the defense is based upon good grounds.] [14]

If you find a verdict for the brick company, then they will be entitled to whatever loss they have sustained. They claim that they have paid $1,550, that they have erected a building which is of no use to them in order to accommodate this dryer that they have spent a certain amount for it, and that by reason of the failure of this machine to work they lost $237.52 on a contract, and they ask you to compel the dryer company to pay them back this amount of money. If they have been deceived in the amount they state and you find that the dryer company guaranteed this machine to do this amount of work and that if it did not do it through no fault of the brick company, then they would be entitled to a verdict at your hands. [But if, on the contrary, you find that there was no guarantee, or that if there was the machine failed because it was improperly constructed or improperly managed, then your verdict would have to be in favor of the dryer company for the amount of their note with interest.] [15] [But if you find a verdict for the plaintiffs you cannot, in any event allow, them the $500 which was paid in October, because then they knew, or say they knew, that it was a failure, and if then they paid any amount of money voluntarily it was at their own risk and they cannot recover it back.] [16]

The defendants, the Martins, have asked me to charge you upon certain points of law.

3. If the jury find from the evidence that the Martin company did guarantee the dryer to dry 32,000 brick per day, and that the dryer would not by proper handling do as guaranteed, then the plaintiffs are not entitled to recover unless you find from the evidence that the plaintiffs made known to the Martin company the failure of the machine to do as guaranteed and gave them an opportunity to alter or adjust the machine so as to give the guaranteed results. *Answer:* I so instruct you: If the jury find that the machine did not do its work as guaranteed it was the duty of the brick company to notify the dryer company to that effect in order to enable them to remedy any defects which might exist therein. [17]

5. If there was a guarantee as alleged by plaintiffs, it was the duty of the plaintiffs to promptly notify the Martin com-

pany of any failure of the machine to do as guaranteed. *Answer:* This is true. [18]

Verdict and judgment for defendants for $663.66.   Plaintiffs appealed.

*Errors assigned* were (1–18) above instructions, quoting them, and (19) that the charge was inadequate.

*Louis M. Childs,* with him *Charles D. McAvoy,* for appellant.

*John Faber Miller,* with him *Samuel H. High,* for appellees.

OPINION BY HENDERSON, J., February 26. 1909:

This action was brought to recover damages from the defendant on an alleged warranty of a brick dryer sold to the plaintiff by the defendant. An action was tried at the same time between the same parties for the balance of purchase money for the apparatus. We are not furnished with a copy of the pleadings, but conclude from the statement of the questions involved that the plaintiff declared on a parol contract of guaranty contemporaneously made with the written agreement under which the dryer was bought.

The first of the questions involved is stated to be "sufficiency of evidence to modify written contract by contemporaneous agreement. A. contracted with B. to purchase a brick dryer to dry a certain number of bricks per day. 'A.' claimed that at the execution of the contract 'B.' guaranteed that it would do the work. This 'B.' denied, etc." The discussion of the case by the appellant's counsel covers a much wider field from which it might be inferred that the plaintiff contended for three positions: (1) that there was an express guaranty in their written agreement with the defendant; (2) that there was a contemporaneous parol agreement of guaranty, and (3) that there was a failure of consideration by reason of the inefficiency of the dryer.

The first sixteen and the nineteenth assignments of error relate to the charge of the court; the seventeenth and eighteenth, to the answers to two of the defendant's points. The appellant made no request for particular instructions and did not submit

any points. The assignments cover small portions of the charge and criticise the court in some instances for having said too little and in others for having assumed too much.

We do not understand the five and one-half lines from the charge set forth in the first assignment to have been intended by the trial judge as a statement of the material facts in the case, nor of the attitude of the respective parties under the contract. It is a brief statement of a part of what was done by the parties under the express terms of the written agreement. It cannot be questioned that the building, the boilers, the piping, the valves, the pallets, etc., were necessary parts of the dryer plant and it is admitted that these were to be furnished by the plaintiff. The court did not undertake to say in this connection what the rights of the parties were either under the written or the alleged parol agreement. It was part of an introductory statement leading up to the inquiry what the contract was between the parties and was not an improper reference to the written agreement. Conceding that a representative of the defendant was present to superintend the setting up of the machinery the fact remains that the plaintiff erected the building and put the parts together. Taking into view the whole structure of the charge it would not have been in logical order to discuss the evidence suggested by the appellant at this point in the charge.

The question raised by the second assignment is not within the statement of the questions involved; for this assignment is based on the contention that there was a written agreement of guaranty in the contract, the allegation being that that part of the contract by which the defendant undertook to furnish "the hereinafter described materials for the construction of one latest improved Martin Patent Steam Dryer having a holding capacity of 32,000 wire cut brick calculated on the basis of nine bricks to each pallet" amounted to a warranty of capacity because of the technical meaning of the word "capacity." Three witnesses were called as experts by whom it was undertaken to show that the word "capacity" in a contract for a brick dryer has reference in the trade to daily productive capacity. Of this evidence it may be said in the first place that none of the witnesses re-

ferred to a contract in which the capacity of the apparatus was restricted and limited to space as in this case. One of them, Mr. Chambers, did not know anything about the trade of selling other brick dryers than tunnel dryers in which he dealt; another, Mr. Briner, did not claim to be an expert and thought the contract ambiguous, the third witness, Mr. Cox, had had experience with but one company and that engaged in the construction of tunnel dryers; and none of them based his opinion on a contract for a holding capacity on a basis of a given number of bricks to each pallet. If the question were before the court under the pleadings the plaintiff failed to show by evidence of this character that there was an agreement in the written contract that the dryer should have a daily productive rather than a containing capacity of 32,000 bricks.

The argument on the third assignment is not elaborated and we do not clearly apprehend the appellant's view. After a careful examination of the evidence we have not found anything which would justify the conclusion that the court had not correctly stated the situation with reference to the plaintiff's allegation that there was a parol agreement of guaranty.

The subject of the fourth assignment is a quotation by the court from the contract and a statement of the defendant's claim with reference thereto. It does not contain any erroneous statement of a legal principle, nor a misstatement of the evidence.

The fifth assignment covers a part of the charge which is pertinent to the very question which the appellant says is involved in the case. The action was founded on the allegation that there was a breach of the contract with subsequent damages. Mr. Boyer for the plaintiff had testified as to the contract under which the dryer was bought and the guaranty. The court very properly instructed the jury that if there was not such an agreement the defendant was entitled to a verdict. The appellant now contends that even if there was not such an agreement there might be an abatement in the price and, therefore, a defense against the payment of the note in the other action. But there is no allegation of deceit; the apparatus was bought after an inspection of a similar plant, and the only objection raised by

the plaintiff was that it was not as productive as they wanted and expected it to be. It did, however, dry from 15,000 to 16,000 brick a day and we do not find anything in the case that would justify the conclusion that it is not what it was sold for, to wit: a brick dryer capable of drying bricks. There is no room for the position now taken by the appellant that even in the absence of a guaranty of effectiveness they might defend against the payment of the price.

The sixth assignment is without merit. It is too plain for discussion that if the failure to properly do the work undertaken by the plaintiff was the cause of the inefficiency of the machine the defendant was not responsible for such failure. The plaintiff was to do certain work in the erection of the building and the machinery. If its part of the undertaking was not well done the defendant is not responsible for it. The court does not assume as is supposed that the dryer was to be constructed by the plaintiff, but the proper completion of the plaintiff's share of the work was presumably essential to the successful operation of the plant, and the fact that the defendant's representative was there to oversee the work does not alter the situation. There was evidence that it was erected in accordance with the plans furnished by the defendant, and testimony was offered on the other hand that Mr. Boyer had ideas of his own and built accordingly. If he did the defendant cannot be made liable for any failure in his designs.

That part of the charge embraced in the seventh assignment should be read in connection with that which immediately precedes it. The court called attention to the testimony of the plaintiff that the dryer did not work well; that it would not dry 32,000 brick in the specified time. It was entirely proper for the court then to direct the attention of the jury to the evidence of the defense undertaking to account for the condition of things, and Mr. Mehaffey, whose testimony was referred to by the court, apparently knew more about it than any of the other witnesses for the defendant for he was the man sent by that company to superintend the construction. When the plaintiff made out a case of the failure of the machine it was appropriate for the defendant to account therefor, and the court properly

directed the attention of the jury to that part of the evidence which presented the defendant's case on this subject

The eighth and ninth assignments are on the same subject and are properly connected with that part of the charge embraced in the seventh assignment. They called the attention of the jury to the defendant's explanation of the defective action of the dryer, but they did not have the effect, we think, to specially impress upon the jury the defendant's view of the case.

The court had evident reference to the testimony of Mr. Mehaffey and Mr. Schaar in that portion of the charge set forth in the tenth assignment. It is true that Mr. Schaar did not say that Mr. Boyer said he had ideas of his own, but said that Mr. Boyer had ideas of his own. The distinction is not material in that connection and the plaintiff was in no way prejudiced.

We cannot agree with the appellant's counsel that in the portions of the charge embraced in the eleventh and twelfth assignments the court assumed that the duty of the defendant was performed by furnishing parts of the dryer. He quoted a portion of the written contract, and said: "If they only contracted to sell parts we can come back to the question," etc. It was the contention of the defendant that it was only to furnish certain parts of the drying apparatus; that the plaintiff was to furnish the other parts; that their original proposition was to furnish a drying plant for $6,000 and that they were willing to guarantee it to be efficient, but that the plaintiff concluded to do a large part of the work itself thereby reducing the price of the portion to be furnished by the defendant from $6,000 to $2,100. The court very properly took notice of that aspect of the case in discussing the question of a guaranty by the defendant.

The thirteenth assignment criticises the court for not having given the plaintiff's explanation of the reason why no complaint was made until in July after the machine was put in operation, but that evidence did not change the time when the complaint was actually made, and the court adverted to that date in connection with the conduct of the company in subsequently giving a note to the defendant for the balance due on the contract and at a still later date making a payment of $500 thereon. The

jury had the plaintiff's explanation, and we think it would not have helped its case to have introduced a consideration of it in connection with the comments of the court on the giving of the note and the subsequent payment thereon.

The fourteenth and sixteenth assignments bear on the same subject. It was legitimate for the jury to take notice of the plaintiff's conduct in giving the note and making the payment thereon after it had ascertained that the dryer was not working according to the alleged guaranty, with a view to determining the good faith of the claim set up, and the court might with propriety present that matter for their consideration.

That part of the charge contained in the fifteenth assignment is based on the issue apparently made up that the defendant was bound to respond to the plaintiff in damages because of a breach of guaranty. That, as we understand from the statement of the question involved, was the issue in the case, and the defendant's liability would be contingent on the failure to perform according to the guaranty.

As we understand the argument of the counsel for the appellant the answers to the points assigned for error in the seventeenth and eighteenth assignments are admitted to be correct. The complaint seems to be that the court should have added something thereto, but it was not the duty of the court to enter into a discussion of the subject presented in the points. If any explanation or elaboration of the answer was desired by the plaintiff the attention of the court should have been called to it. Assignments of error to the effect that the court below did not specifically charge as to certain matters will not be considered where no request for such instructions on such matters is made: Murtland v. English, 214 Pa. 325.

The nineteenth assignment that the charge as a whole presents the case to the jury in a manner less favorable than that to which the plaintiff was entitled does not seem to us to be sustained. The points of controversy as exhibited by the evidence and the charge of the court related to the allegation of a contract of guaranty and the question whether the plaintiff bought a brick dryer or merely parts of a dryer, and these questions were fully and we think not unfairly presented to the jury

by the court.  The charge occupies fourteen pages of the paper-book.  It left to the jury very clearly and fairly the question whether the guaranty alleged by the plaintiff was made, and also the question whether under the contract the dryer company agreed to furnish a dryer taken as a whole or whether they merely contracted to furnish certain materials, the brick company to provide the others and to construct it according to the plans and specifications of the dryer company.  A charge of a court alleged to be inadequate should be viewed on appeal with reference to its general effect.  If as a whole it is not calculated to mislead it is not erroneous.  It is not difficult in a charge growing out of controverted allegations of fact to select some portion which, apart from its context, seems subject to objection, but it would be unjust to the trial judge and obstructive to the administration of justice to take strict account of a single period without reference to the other portions of the charge.  There were no assignments of error to the admission of evidence, and we may assume, therefore, that the appellants introduced all the evidence which they considered relevant and that none was introduced on the other side which was incompetent.  The facts were fully presented and the appellant failed to persuade us that the case was not well disposed of in the court below.

The judgment is affirmed.